The **CITY OF PASADENA**, Appellant,

v.

Lois **FREEMAN** as Administratrix of the Estate of James Floyd Jordan, Jr., et al., and Lester S. Tice, et al., Appellees.

No. A14–86–115–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 16, 1987.

Rehearing Denied May 21, 1987.

Lee Clark, Pasadena, for appellant.

William A. Odom, Roy Murphy, III, Phillip A. Pfeifer, James S. Kelly and Michael Maness, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and MURPHY and ROBERTSON, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

The City of Pasadena appeals a judgment based upon a jury verdict in favor of several plaintiffs. The suit arose out of a tragic one-car accident in which two boys were killed and two injured when their car crashed into a drainage ditch in Pasadena. The jury found the City of Pasadena negligent in failing to erect a barricade or a temporary barricade to warn motorists that the street on which the boys were travelling made a dead end into a ditch.

The major issues on appeal concern (1) the nature of the city's duty; (2) the award of bystander damages to plaintiffs who did not witness the accident, and (3) the sufficiency of evidence to support an award of future medical expenses.

The night of May 26, 1983, James (Jimmy) Floyd Jordan, Jr., was driving his 1971 Pontiac with passengers David Tice, Eric Creel, and Jeffrey Jordan, Jimmy's brother. The boys travelled north on Alabama Street and turned east (right) onto Wyatt Street. At a distance of 762 feet from its "L" intersection with Alabama, Wyatt made another "L" intersection turning to the south (right) onto Jana Street because a drainage ditch intersected Wyatt. The ditch ran parallel to Jana. Wyatt was a concrete residential street. There was no curb at the east end of Wyatt where it intersected with Jana. Across the ditch, Wyatt Street continued in a straight line. Witnesses stated that it was not apparent that the ditch intersected Wyatt Street. Other than a dead end sign posted on Wyatt about 15 feet from its intersection with Alabama, there was no warning sign notifying motorists that Wyatt Street ended and the pavement turned to the right.

In April 1982 another driver had driven off the end of Wyatt and crashed into the same ditch at night while travelling in the same direction as the boys did. After that accident Pasadena police officers sent a "traffic hazards—condition report" to the city's traffic engineer department. A staff member of that department made a field investigation and recommended that a large yellow arrow sign be installed at the "L" intersection of Alabama and Wyatt Streets and a barricade be installed at the end of Wyatt at its "L" intersection with Jana. Mike McInturff, the city's director of the traffic and transportation department, initiated a work order for his department to put up the recommended signs. The yellow arrow sign was installed at the end of Alabama, but no warning was placed at the end of Wyatt until after the fatal May 26, 1983, accident.

Jimmy Jordan and David Tice were killed in the accident. Their families filed wrongful death actions. Jeff Jordan and Eric Creel sued for personal injury damages. The jury found that the City of Pasadena was 90 percent negligent in failing to erect a barricade and failing to erect a temporary barricade at the end of Wyatt Street before May 26, 1983. It found Jimmy Jordan 10 percent negligent in driving at a greater rate of speed than a person using ordinary care would have driven.

The jury awarded Lester Tice and Marilyn Tice, David's natural parents, and Lois Freeman, Jimmy Jordan's natural mother, wrongful death damages of $750,000 each. John Freeman, Jimmy's stepfather, was also awarded $750,000 in damages for past and future physical pain and mental anguish suffered as a result of "seeing the circumstances surrounding the death of Jimmy Jordan." Jeff Jordan was awarded $161,000 in personal injury damages and $50,000 for future medical expenses. Eric Creel was awarded $170,000 in personal injury damages and his mother, Grace Creel, was awarded $12,500 for injuries sustained "subsequent to the occurrence in question." All past medical and funeral expenses were stipulated and included in the final judgment.

The city's first four points of error all concern the nature of the city's duty to warn motorists like Jimmy Jordan that Wyatt Street ended in a drainage ditch. In point of error 3 the city contends that it is totally immune from suit because erection

of a barricade falls under the city's governmental function of controlling traffic. Under the common law, a governmental entity cannot be held for the negligent performance of a governmental function. *City of Houston v. Quinones*, 142 Tex. 282, 177 S.W.2d 259, 261 (1944). Alternatively, in point of error 4, the city argues that damages should be limited to the $300,000 allowed under the Tort Claims Act.[*] Both points depend upon the premise that a barricade is a traffic control device used in conjunction with the city's power to regulate traffic. The city cites *Villarreal v. City of San Antonio*, 657 S.W.2d 175, 177 (Tex.App.—San Antonio 1983, no writ), as authority for that premise.

■ We decline to follow *Villarreal* and hold that the erection of a barricade falls under the city's proprietary function of maintaining city streets. Therefore, the city enjoys no immunity from suit and the Tort Claims Act limitations on damages do not apply.

Traffic control is a governmental function. It arises out of the city's police power to regulate traffic. *Palmer v. City of Benbrook*, 607 S.W.2d 295, 298 (Tex.Civ. App.—Fort Worth 1980, writ ref'd n.r.e.). Before the Tort Claims Act, cities were immune from suits alleging that the plaintiffs were harmed because the city was negligent in controlling traffic. *E.g., Parson v. Texas City*, 259 S.W.2d 333 (Tex.Civ. App.—Fort Worth 1953, writ ref'd). Since January 1, 1970, the Tort Claims Act has provided plaintiffs the opportunity to sue cities and other governments for claims arising from the absence, condition, or malfunction of any traffic or road sign, signal or warning device provided that the governmental unit responsible had notice of the problem and failed to act within a reasonable time. *See* Tex.Civ.Prac. & Rem. Code Ann. art. § 101.060 (Vernon 1986). Cities remain totally immune from liability arising from the failure to initially place a sign, signal or warning device when such failure is the result of discretionary actions of the city. *Id.*

Courts have held that maintaining traffic signals, posting the correct speed limit, keeping stop signs unobscured by tree limbs, and regulating parking on a narrow street are all governmental functions in that they involve traffic regulation. *Sparkman v. Maxwell*, 519 S.W.2d 852 (Tex.1975), *City of Houston v. Stoddard*, 675 S.W.2d 280 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), *Kenneally v. Thurn*, 653 S.W.2d 69 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.), *Parson v. Texas City*, 259 S.W.2d 333 (Tex.Civ.App.— Fort Worth 1953, writ ref'd) (all involving malfunctioning or improper traffic signals); *Alvarado v. City of Lubbock*, 685 S.W.2d 646 (Tex.1985) (posting wrong speed limit; it was not contended that a proprietary function was involved); *Lorig v. City of Mission*, 629 S.W.2d 699 (Tex.1982) (stop sign obscured); *Palmer v. City of Benbrook*, 607 S.W.2d 295 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.) (regulation of parking on a narrow street). In all of these cases the traffic control devices had something to do with regulation of traffic, that is, they instructed a driver as to when he may enter an intersection, where he may park, and how fast he may drive. A barricade, on the other hand, is a warning sign meant to instruct a driver about a dangerous hazard or condition in or near the street. In this case the hazard was a drainage ditch.

■ Maintaining streets in a safe condition is a proprietary function and a city is liable for its negligence in the performance of this function. *Jezek v. City of Midland*, 605 S.W.2d 544, 546 (Tex.1980). A city's duty to maintain safe streets is not limited to the travelled portion of the street. *Id.* When a hazard or dangerous condition is in such proximity to the street that it is not improbable that it would result in injury to those using the street in the ordinary man-

---

[*] Tort Claims Act, ch. 292, 1969 Tex.Gen.Laws 874, *amended by* Act of April 18, 1973, ch. 50, 1973 Tex.Gen.Laws 77, *amended by* Act. of June 19, 1983, ch. 530, 1983 Tex.Gen.Laws 3084, *repealed by* Act of June 16, 1985, ch. 959, 1985 Tex.Sess.Law Serv. 7043 (Vernon). The provisions of the Tort Claims Act are now codified as Title 5 of the Civil Practice and Remedies Code. Citations will be to the current code.

ner, the city has a duty to either remove the hazard, *Id.*, or adequately warn motorists so that the road is made safe. *City of Irving v. Shipp*, 342 S.W.2d 449, 451 (Tex. Civ.App.—Fort Worth 1961, writ ref'd n.r. e.). The city's duty to keep its streets in a reasonably safe condition is a mandatory duty. *City of Houston v. Hagman*, 347 S.W.2d 355, 360 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.). The jury found that the city was negligent in failing to erect a barricade or temporary barricade. Under the facts in this case, we consider the barricade a warning sign necessitated by the city's mandatory duty to perform a proprietary function of maintaining safe streets.

The supreme court pointed out the difference between warning signs and traffic control signs in *City of Austin v. Schmedes*, 154 Tex. 416, 279 S.W.2d 326, 330 (1955). In that case the city failed to adequately warn traffic going south that the street became a one-way street for northbound traffic while road repairs were being made. The plaintiff recovered from the city.

> The duty of a city to erect signs at the site of street improvements does not arise out of its police power to control and regulate traffic which it may perform negligently or not at all without risk of liability, but is imposed by law for the protection of the public against immediate dangers created in the performance of the proprietary function of maintaining and improving its streets. The fact that the performance of the duty requires an incidental regulation of traffic does not detract from the duty or change the character of the function which gave rise to the danger.

*Id.*

Long before the Tort Claims Act, plaintiffs recovered damages from cities for failure to erect a barricade or warn of hazards associated with the roadway. In *City of Fort Worth v. Lee*, 143 Tex. 551, 186 S.W.2d 954 (1945), a city was held liable for injuries sustained by a boy who rode his bicycle off the end of a street and crashed into a railroad cut 55 feet from the edge of the roadway. In *City of Irving v. Shipp*, 342 S.W.2d 449 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n.r.e.), a city was held liable for negligently failing to erect a barricade to warn motorists that the road ended in a ditch. In *City of Beaumont v. Kane*, 33 S.W.2d 234 (Tex.Civ.App.—Beaumont 1930, writ dism'd), the city negligently failed to warn a motorist that the street ended, and the plaintiff drove onto a wharf and into a river.

■ Nothing in the Tort Claims Act changes the city's common law duty to maintain safe streets or the fact that street maintenance is a proprietary function. The Tort Claims Act reads: "This chapter does not apply to a proprietary function of a municipality." Tex.Prac. & Rem.Code Ann. § 101.058 (Vernon 1986). The supreme court has rejected the appellant's argument that the act now puts a ceiling on the damages that can be recovered from a city for failure to perform proprietary duties involving warning signs. *Turvey v. City of Houston*, 602 S.W.2d 517, 519 (Tex. 1980). Points of error 3 and 4 are overruled.

■ Now that we have traced the origin of the city's duty we can more easily address the city's first two points of error. In those points the city contends the trial court erred in rendering judgment because the city had no duty to erect a barricade at the end of Wyatt Street because the proper warning device was a large yellow arrow sign. To support its argument the city refers us to portions of the *1980 Texas Manual on Uniform Traffic Control Devices*, a document the trial court judicially noticed, and the trial testimony of the city's traffic engineer. In the engineer's opinion a barricade was an improper warning device for that location because Wyatt Street made a right turn into Jana Street. Under our interpretation of the manual, either a barricade or a yellow arrow sign would have been acceptable to warn of the hazardous ditch. The portions of the manual instructing on the proper use of these two signs are not couched in mandatory terms. Section 2C–9 instructs: "A Large Arrow sign is intended to be used to give notice of

a sharp change of alignment in the direction of travel." Section 3F–1 states: "Red and white barricades are to warn and alert drivers of the terminous of a road, street or highway in other than construction or maintenance areas." At the intersection of Wyatt and Jana the pavement made a sharp change of alignment. Wyatt Street also terminated into a ditch. The jury heard testimony that the city had intended to place a permanent barricade at the end of Wyatt, but failed to do so because of a shortage of red and white reflective sheeting. The jury also heard that temporary barricades were available, but not used. The city had a duty to warn of the hazard in some manner. The plaintiffs chose to submit to the jury specific failures to warn with either a temporary or permanent barricade. There was no error in submitting the issues as worded. Points of error one and two are overruled.

In points of error 6 and 7 the City of Pasadena attacks the award of bystander damages to John Freeman, the stepfather of Jimmy Jordan, and Grace Creel, the mother of Eric Creel, because the evidence was insufficient to establish that their injuries were foreseeable by the defendant city as a proximate cause of its failure to erect a temporary or permanent barricade. We sustain these points. As a matter of law, these appellees' injuries are not compensable.

When a defendant's negligence causes manifest mental anguish that is foreseeable by the defendant, a bystander may recover damages. *Hastie v. Rodriguez*, 716 S.W.2d 675, 676 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Under the facts in this case neither John Freeman nor Grace Creel satisfy the three-pronged test for foreseeability so often recited by our intermediate appellate courts. *E.g.*, *McClellan v. Boehmer*, 700 S.W.2d 687 (Tex.App.—Corpus Christi 1985, no writ); *City of Austin v. Davis*, 693 S.W.2d 31, 33 (Tex.App.—Austin 1985, writ ref'd n.r.e.); *Genzer v. City of Mission*, 666 S.W.2d 116 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *General Motors Corp. v. Grizzle*, 642 S.W.2d 837, 844 (Tex.Civ.App.—Waco 1982, writ dism'd w.o.j.); *Landreth v. Reed*, 570 S.W.2d 486, 489 (Tex.Civ.App.— Texarkana 1978, no writ).

Neither plaintiff witnessed the accident. Their shock did not result from a direct emotional impact from a contemporaneous perception of the accident. John Freeman was in bed at the time of the accident. Someone came to his house to tell him and his wife that an accident had occurred. He rushed to the scene and arrived in time to see the car in the ditch and his son Jeffrey in an ambulance, but he did not see Jimmy until later that evening in the hospital. Grace Creel learned of the accident the morning after. While there was evidence that John Freeman and his son Jimmy were close, he was not the boy's natural father. The bystander cause of action has been gradually expanded over the years. We decline to expand it further. *Cf. Hastie v. Rodriguez*, 716 S.W.2d at 676 (woman could not recover bystander damages for witnessing the death of man with whom she lived for five years). We sustain points of error 6 and 7. The city did not timely object to the special issue concerning John Freeman on the ground raised in point of error 5 (no pleading), so we must overrule that point. Because we have held that John Freeman had no cause of action, we need not discuss points of error 8, 9 and 10.

In points of error 11 and 12, the city complains that the award of $50,000 for future medical expenses to Jeffrey Jordan was grossly excessive and requires remittitur. In deciding this question we employ the same test as for any factual insufficiency question. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). After examining all the evidence in the record, we hold that the evidence is sufficient to support the award. The city and Lois Freeman, as next friend of Jeffrey, stipulated that the reasonable medical and hospital bills for care and treatment of Jeffrey in the past was $8,415.20. The only evidence regarding future medical expenses came in the deposition testimony of a psychiatrist who had treated Jeffrey and diagnosed "post traumatic stress disorder of a chronic type as-

sociated with an anxiety component and a strong depressive component." The jury heard details of the problems Jeffrey was having adjusting to the loss of his brother and dealing with memories of the accident.

The psychiatrist stated that Jeffrey needed treatment and recommended for the first year at least, weekly individual psychotherapy counseling ($90 a session), weekly group therapy sessions ($65 a session), and weekly biofeedback sessions ($40 a session). The doctor "hoped" that the frequencies of treatments could be reduced to one per month for the second year. He could only "guess" how long the follow-up treatment would last. From this evidence the jury could have reasonably inferred that treatment for Jeffrey's disorder would extend beyond two years. The award is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.*

We affirm the trial court's judgment as to all of the plaintiffs except John Freeman and Grace Creel. Those parts of the judgment that awarded John Freeman and Grace Creel bystander damages are in error and we modify the judgment accordingly.

MURPHY, Justice, dissenting.

I respectfully dissent. In *Villarreal v. City of San Antonio*, 657 S.W.2d 175 (Tex. App.—San Antonio 1983, no writ), the court said:

We hold that failure to erect a barricade at the end of a dead end street is a governmental function to which the provisions of the Texas Tort Claims Act, Tex.Rev.Civ.Stat.Ann. art. 6252–19, § 1 et seq., (Vernon 1970) apply.

The court went on to reason:

Regulation of traffic is a governmental function. *Lorig v. City of Mission*, 629 S.W.2d 699, 700 (Tex.1982); *City of Austin v. Daniels*, 160 Tex. 628, 335 S.W.2d 753, 754 (1960). A "barricade" is officially defined as a traffic control device to warn or alert drivers of the termination of a road and it may be used to mark the end of a roadway other than construction or maintenance areas. STATE DE-PARTMENT OF HIGHWAYS AND TRANSPORTATION: Texas Manual On Uniform Traffic Control Devices For States and Highways, 2A1.1 and 3F1. Therefore, a barricade, that may be used to mark the end of a roadway other than construction or maintenance areas, is intended to regulate traffic for the safety of the public generally. In the instant case, unlike those cases involving road signs which warned of construction or improvements to a street and were characterized as proprietary function cases, the barricade in question would have marked the end of the street and warned the public in general of the end of the roadway and the existing concrete culvert.

The majority, without citing any authority, concludes that "a barricade ... is a *warning* sign meant to instruct a driver about a dangerous hazard or condition in or near the street. In this case the hazard was a drainage ditch." They further say "we consider the barricade a warning sign necessitated by the city's mandatory duty to perform a proprietary function of maintaining safe streets." Why can not a barricade be used as a traffic control device to warn or alert drivers of the termination of a road or mark the end of a roadway other than in construction or maintenance areas as was decided in *Villarreal?*

Although this case doesn't concern a truly dead end street, (that is one with no outlet) apparently the City of Pasadena considered it such because the city had erected a dead end sign on the south side of Wyatt street, approximately 700 feet west of the "L" intersection.

In *City of Houston v. Jean*, 517 S.W.2d 596 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.), Jean was injured when she drove her automobile off a dead end street into an adjacent ditch. There was no barricade at the end of the "T" intersection indicating the end of the street or the presence of the ditch. The court held "the City was under a duty to warn or protect against any special defect such as an excavation or obstruction in the street or in such proximity to the street as to

render travel unsafe. *Gabbert v. City of Brownwood,* 176 S.W.2d 344 (Tex.Civ.App.—Eastland 1943, writ ref'd). *See also* Tex. Rev.Civ.Stat.Ann. art. 6252–19, § 14(12) (Vernon 1970) (Texas Tort Claims Act) (now codified at Tex.Civ.Prac. & Rem.Code § 101.060 (Vernon 1986)).

In my opinion, cases such as this should not be decided on the basis of how a "barricade" or other device is characterized. The San Antonio Court of Appeals in *Villarreal supra,* at least relied upon the Texas Manual On Uniform Traffic Control Devices For States and Highways to reach the conclusion that a barricade is a traffic control device. The majority, on the other hand, reasons from pre-Tort Claim Act cases that the erection of a barricade had to do with a city's duty to maintain safe streets, even if there is evidence, as here, that there was no construction and no improvements were taking place.

Article 6252–19 § 14(12), Vernon's Tex. Rev.Civ.Stat.Ann., now Civil Practice and Remedies Code, Chapter 101 provided:

"(12) Any claim arising from the *absence,* condition, or malfunction *of any* traffic or road sign, signal, or *warning device* unless such absence, condition, or malfunction shall not be corrected by the governmental unit responsible within a reasonable time after notice, or any claim arising from the removal or destruction of such signs, signals or devices by third parties except on failure of the unit of government to correct the same within such reasonable time, after actual notice. Nothing herein shall give rise to liability arising from the failure to any unit of government to *initially* place any of the above signs, signals, or devices when such failure is the result of discretionary actions of said governmental unit. *The signs, signals and warning devices enumerated above are those used in connection with hazards normally connected with the use of the roadway, and this section shall not apply to the duty to warn of special defects such as excavations or roadway obstruction."* (emphasis ours)

I would hold that the City of Pasadena, if liable, is liable only under the provisions of article 6252–19 § 14(12). This case involves an initial placement of a barricade. Whether the City of Pasadena had discretion to initially erect a barricade is an issue of fact.